Mary L. Perry - #175911
mperry@uselaws.com
Jerry J. Schlichter - #0545143
jschlichter@uselaws.com
Schlichter, Bogard & Denton
100 South Fourth Street, Suite 900
St. Louis, MO 63102
Tel: 314-621-6115
Fax: 314-621-7151

Attorneys for Plaintiffs and Class Representatives as set forth on the signature page;

FILED
CLERK, U.S. DISTRICT COURT
SEP 28 2006
CENTRAL DISTRICT OF CALIFORNIA
BY DEPUTY

**IN THE UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

JSL (JCx)

**SHIRLEY WALDBUESSER, GARY GRABEK, MARK A. GEUDER, DWITE RUSSELL and JULIE SPICER, individually and on behalf of all those similarly situated,**

**Plaintiffs,**

**v.**

**NORTHROP GRUMMAN CORPORATION, THE NORTHROP GRUMMAN CORPORATION SAVINGS PLAN ADMINISTRATIVE COMMITTEE, NORTHROP GRUMMAN CORPORATION COMPENSATION AND MANAGEMENT DEVELOPMENT COMMITTEE OF THE BOARD OF DIRECTORS, NORTHROP GRUMMAN CORPORATION SAVINGS PLAN INVESTMENT COMMITTEE, J MICHAEL HATELEY as Corporate Vice President and former Chief Human Resources**

CV 06-06213

**CLASS ACTION**

**CASE NUMBER**

**JURY TRIAL DEMANDED**

DOCKETED ON CM
OCT - 4 2006
BY 019

N/S
L/N

(1)

**And Administrative Officer, IAN ZISKIN, as Chair of the Administrative Committee and Corporate Vice President and Chief Human Resources and Administrative Officer, DENNIS WOOTAN, as Secretary of the Administrative Committee, JOHN T. CHAIN, JR., LEWIS W. COLEMAN, PHILLIP FROST, KEVIN SHARER, PHILIP A ODEEN, RICHARD MYERS, AND STEPHEN FRANK all in their capacities as Members of the Compensation and Management Development Committee and as Members of the Northrop Grumman Corporation Board of Directors; RYAN HAMLIN, as Corporation Director of Investments; ROSE MARY ABELSON, as Member of the Investment Committee; AND VIC FAZIO, CHARLES LARSON, AULANA PETERS AND RONALD D. SUGAR, as Members of the Board of Directors,**

**Defendants.**

## COMPLAINT FOR BREACH OF FIDUCIARY DUTY

## INTRODUCTION

1. Personal savings accounts, such as 401(k)s, are quickly becoming employees' primary method of financially planning for retirement. For many employees in the United States today, an employer-provided defined benefit pension awaiting their retirement is a quaint, historical notion.

2. In 401(k) plans, employers provide an opportunity for employees to save their own pre-tax dollars in individual 401(k) accounts. The accounts

provide a number of investment alternatives into which employees place a portion of their current income with the hope of earning, over time, a return sufficient to support themselves and their families in retirement.

3. Accordingly, in 401(k) plans, the return on employees' investments is critical. Even seemingly small reductions in a participant's return in one year may substantially impair his or her accumulated savings at retirement.

4. While such reductions in 401(k) accounts' returns may result from market fluctuations, a consistent, albeit rarely discussed, force reducing 401(k) accounts' earnings is the administrative fees and expenses assessed against account balances.

5. The most certain means of increasing the return on employees' 401(k) savings is to reduce the fees and expenses employees pay from their 401(k) accounts.

6. Unlike generalized market fluctuations, employers can control these fees and expenses. Federal law requires them to do so.

7. Under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* ("ERISA"), an employer who provides a 401(k) plan for its employees is a "Plan Sponsor." The employer or its agent may also serve as "Plan Administrator," or the employer may appoint a third party to serve as

such. Both the Plan Sponsor and the Plan Administrator are fiduciaries of the 401(k) plan. The Plan Administrator performs or contracts for administrative, record-keeping, investment management, and other services from entities in the financial and retirement industries. ERISA requires that the fees for these services be reasonable, incurred solely for the benefit of Plan participants, and fully disclosed.

8. For providing various services, third-party plan administrators, record-keepers, consultants, investment managers, and other vendors in the 401(k) industry have developed a variety of pricing and fee structures.

9. At best, these fee structures are complicated and confusing when disclosed to Plan participants. At worst, they are excessive, undisclosed, and illegal.

10. In this action, pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a), Plaintiffs and Class Representatives, on behalf of all similarly situated participants and beneficiaries of the Northrop Grumman Savings Plan (the "NGS Plan"), Plan 011, seek to recover the losses suffered by the NGS Plan on a plan wide basis and to obtain injunctive and other equitable relief for the NGS Plan from the NGS Plan's fiduciaries based upon their breaches of their fiduciary duties.

11. Also in this action, pursuant to ERISA § 502(a), Plaintiffs and Class Representatives, on behalf of all similarly situated participants and beneficiaries of the Northrop Grumman Financial Security and Savings Plan (the "FSS Plan"), Plan 010, seek to recover the losses suffered by the FSS Plan on a plan wide basis and to obtain injunctive and other equitable relief for the FSS Plan from the FSS Plan's fiduciaries based upon their breaches of their fiduciary duties.

12. As set forth in detail below, the fees and expenses paid by the Plans, and thus borne by the participants in the Plans, were and are unreasonable and excessive; not incurred solely for the benefit of the Plans and their participants; and undisclosed to participants. By subjecting the Plans and their participants to these excessive fees and expenses, and by other conduct set forth below, the Defendants violated their fiduciary obligations under ERISA.

## PARTIES, JURISDICTION AND VENUE

### Plaintiffs

13. Plaintiff and Class Representative Shirley Waldbuesser lives in Rolling Meadows, Illinois, within the Northern District of Illinois.

14. Plaintiff and Class Representative Gary Grabek lives in Schaumburg, Illinois, within the Northern District of Illinois.

15. Plaintiff and Class Representative Mark A. Geuder lives in Woodstock, Illinois, within in the Northern District of Illinois.

16. Plaintiffs Waldbuesser, Grabek and Gueder are all participants in the NGS Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7).

17. Plaintiff and Class Representative Dwite Russell lives in Springfield, Missouri.

18. Plaintiff and Class Representative Julie Spicer lives in Springfield, Missouri.

19. Plaintiffs Russell and Spicer are participants in the FSS Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7).

**Defendants**

20. Defendant Northrop Grumman Corporation is a Delaware corporation with its headquarters in Los Angeles, California, within the Central District of California. It manufactures aircraft and aircraft subassemblies, electronic systems, and components for military and commercial use, and operates and supports computer systems. It is the sponsor and an administrator of the Plans, within the meaning of ERISA § 3(16), 29 U.S.C. § 1002(16), and is the employer and principal of the Plans' other administrators. It is also a

fiduciary with respect to the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

21. A department within Northrop Grumman Corporation has been delegated authority to select investment managers for the Plans. The Investment Trust Administration Department (ITA). The ITA Department, composed of Northrop Grumman employees acting within the scope of their responsibility as employees, has the responsibility for recommending and implementing investment policies and investment fund objectives, for developing investment manager guidelines and benchmarks, for selecting, appointing, and terminating investment managers, investment consultants and other financial services companies, for entering into agreements with investment managers, for monitoring the conduct of investment performances, the investment managers and others connected with the investment of the Plans' assets, for communicating policies and objectives relating to the investment of the Plans' assets to the investment managers. For these additional reasons, Northrop Grumman Corporation is a fiduciary of the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

22. Defendant Northrop Grumman Corporation Savings Plan Administrative Committee ("Administrative Committee"), whose members are

Northrop Grumman executives and officers, is a "named fiduciary" (as defined in ERISA § 402(a)(2), 29 U.S.C. § 1102(a)(2)) to the NGS Plan and the FSS Plan for all purposes other than investment matters. Moreover, because the Administrative Committee enters into contracts on behalf of the NGS Plan and FSS Plan and authorizes the payment of expenses from the Plans' assets, the Administrative Committee and its members are fiduciaries with respect to the NGS Plan and the FSS Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

23. Defendant J. Michael Hateley is Corporate Vice President of Northrop Grumman and has been the Chief Human Resources and Administrative Officer of Northrop Grumman. He is a member of the Administrative Committee. As a member, he is a fiduciary with respect to the NGS Plan and the FSS Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

24. Defendant Ian Ziskin is or was at the relevant time the Chair of the Administrative Committee. He is currently the Corporate Vice President and the Chief Human Resources and Administrative Officer for Northrop Grumman. In this position, he is a fiduciary with respect to the NGS Plan and the FSS Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

25. Defendant Dennis W. Wootan is the Secretary of the Administrative Committee. In this position, he is a fiduciary with respect to the NGS Plan and the FSS Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

26. Defendant Northrop Grumman Corporation Compensation and Management Development Committee of the Board of Directors ("Compensation Committee") has as its members John T. Chain Jr., Lewis W. Coleman, Phillip Frost, Kevin Sharer, Philip A. Odeen, Richard Myers and Stephen Frank, all of whom are directors of Northrop Grumman. The Compensation Committee appoints and/or terminates the members of the Administrative Committee, and selects the chair and secretary of the Administrative Committee, all of whom serve at the Compensation Committee's pleasure. The Compensation Committee shares with the Administrative Committee the responsibility for selecting additional fiduciaries, and for monitoring their performance. The Compensation Committee and its members are fiduciaries with respect to the NGS Plan and the FSS Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

27. Defendant Northrop Grumman Corporation Savings Plan Investment Committee ("Investment Committee"), whose members are

Northrop Grumman employees and officers, selects the investment options available to NGS Plan and FSS Plan participants, hires the investment managers and trustees, gives them their investment directives, oversees their performance, and has the authority to change the investment directives and/or investment managers and trustees in the future. The Investment Committee has the responsibility to periodically review the performance of the investment managers it hires and to report those results to the Board of Directors for review. The Investment Committee is a "named fiduciary" (as defined in ERISA § 402(a)(2), 29 U.S.C. § 1102(a)(2)) with respect to the Plans' investments and is a fiduciary with respect to the NGS Plan and the FSS Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

28. Defendant Ryan Hamlin is Northrop Grumman's Corporate Director, Investments, and a member of the Investment Committee. In these roles, he is a fiduciary with respect to the NGS Plan and the FSS Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

29. Defendant Rose Mary Abelson is a member of the Investment Committee. As a member, she is a fiduciary with respect to the NGS Plan and the FSS Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

30. The Northrop Grumman Board of Directors and its members appoint, monitor, and/or terminate the members of the Investment Committee, who serve at the Board's pleasure. The members of the Board of Directors are John T. Chain Jr., Lewis W. Coleman, Vic Fazio, Stephen Frank, Phillip Frost, Charles R. Larson, Kevin Sharer, Philip A. Odeen, Richard Myers, and Aulana Peters. The Board also has the discretion to appoint investment managers directly. The Board and the Directors are fiduciaries of the NGS Plan and the FSS Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C., § 1002(21)(A).

31. Defendant John T. Chain, Jr. is a member of the Northrop Grumman Corporation Board of Directors and a member of the Compensation Committee. In each of these positions, he is a fiduciary with respect to the NGS Plan and the FSS Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

32. Defendant Lewis W. Coleman is a member of the Northrop Grumman Corporation Board of Directors and a member of the Compensation Committee. In each of these positions, he is a fiduciary with respect to the NGS Plan and the FSS Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

33. Defendant Phillip A. Frost is a member of the Northrop Grumman Corporation Board of Directors and a member of the Compensation Committee. In each of these positions, he is a fiduciary with respect to the NGS Plan and the FSS Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

34. Defendant Philip A. Odeen is a member of the Northrop Grumman Corporation Board of Directors and a member of the Compensation Committee. In each of these positions, he is a fiduciary with respect to the NGS Plan and the FSS Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

35. Defendant Kevin Sharer is a member of the Northrop Grumman Corporation Board of Directors and a member of the Compensation Committee. In each of these positions, he is a fiduciary with respect to the NGS Plan and the FSS Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

36. Defendant Stephen Frank is a member of the Northrop Grumman Corporation Board of Directors and a member of the Compensation Committee. In each of these positions, he is a fiduciary with respect to the NGS Plan and the FSS Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

37. Defendant Vic Fazio is a member of the Northrop Grumman Corporation Board of Directors. In this position, he is a fiduciary with respect to

the NGS Plan and the FSS Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

38. Defendant Charles Larson is a member of the Northrop Grumman Corporation Board of Directors. In this position, he is a fiduciary with respect to the NGS Plan and the FSS Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

39. Defendant Aulana Peters is a member of the Northrop Grumman Corporation Board of Directors. In this position, she is a fiduciary with respect to the NGS Plan and the FSS Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

40. Defendant Ronald D. Sugar is a member of the Northrop Grumman Corporation Board of Directors. In this position, he is a fiduciary with respect to the NGS Plan and the FSS Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

## Jurisdiction and Venue

41. Plaintiffs seek relief on behalf of the Plans through the mechanisms found in ERISA § 409, 29 U.S.C. § 1109, and ERISA § 502, 29 U.S.C. § 1132.

Therefore, this Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1).

42. All Defendants are subject to service of process issued from this Court pursuant to 29 U.S.C. § 1132(e)(1)(2).

43. Venue of this action is proper pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2). Both of the Plans are administered from Northrop Grumman's headquarters in Los Angeles within this district, and because the Defendants may be found here.

**The Plaintiff Classes**

44. Plaintiffs Waldbuesser, Geuder and Grabek bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of themselves and all similarly situated participants and beneficiaries. They seek to represent the following Class (the "NGS Plan Class"):

> All persons, *excluding the Defendants, the Committees and/or other individuals who are or may be liable for the conduct described in this Complaint,* who are or were participants or beneficiaries of the NGS Plan and who were or may have been affected by the conduct set forth in this Complaint, as well as those who will become participants or beneficiaries of the NGS Plan in the future.

45. Plaintiffs Russell and Spicer bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of themselves and all

similarly situated FSS Plan participants and beneficiaries. They seek to represent the following Class (the "FSS Plan Class"):

> All persons, *excluding the Defendants, the Committees and/or other individuals who are or may be liable for the conduct described in this Complaint,* who are or were participants or beneficiaries of the FSS Plan and who were or may have been affected by the conduct set forth in this Complaint, as well as those who will become participants or beneficiaries of the FSS Plan in the future.

46. Certification of this class is proper under Rule 23(a) because all prerequisites are satisfied:

A. **Numerosity.** The members of the Class are so numerous that joinder of all members is impracticable. Although the Plaintiffs do not know the exact number of Class members as of the date of filing, there were 114,634 participants with account balances in the NGS Plan at the end of the 2004 plan year. At the end of the 2003 plan year, there were 23,955 participants with account balances in the FSS Plan.

B. **Commonality.** Common issues of fact and law predominate over any issues unique to individual class members. Issues that

are common to all class members include, but are not limited to, whether the Defendants:

i. Charged fees and expenses to the Plans that were, or are, unreasonable and/or not incurred solely for the benefit of participants and beneficiaries of the Plans;

ii. Caused the Plans to enter into agreements with third parties which caused and/or allowed the Plans to pay fees and expenses that were, or are, unreasonable and/or not incurred solely for the benefit of participants and beneficiaries of the Plans;

iii. Failed to monitor the fees and expenses paid by the Plans and, by such failure, caused or allowed the Plans to pay fees and expenses that were, or are, unreasonable and/or not incurred solely for the benefit of participants and beneficiaries of the Plans;

iv. Failed to inform themselves of, and understand, the various methods by which vendors in the 401(k) retirement industry collect payments and other revenues from 401(k) plans;

v. Failed to establish, implement, and follow procedures to properly and prudently determine whether the fees and expenses paid by the Plans were reasonable and incurred solely for the benefit of the participants and beneficiaries of the Plans;

vi. Failed properly to inform and/or disclose to participants and beneficiaries of the Plans the fees and expenses that are, or have been, paid by the Plans;

vii. Failed to inform and/or disclose to participants and beneficiaries of the Plans in proper detail and clarity the transaction fees and expenses which affect participants' accounts balances in connection with the purchase or sale of interests in investment alternatives;

viii. Breached their fiduciary duties by failing to disclose that hidden and excessive fees were and are being assessed against assets of the Plans and by failing to stop such hidden excessive fees;

ix. Appointed as fiduciaries persons who did not fulfill their fiduciary duties, failed to monitor and/or oversee

the performance of those fiduciaries and to ensure that they were fulfilling those duties, and failed to terminate the fiduciaries' appointment after breaches occurred;

x. In charging, causing to be charged or paid, and failing to monitor the fees and expenses of the Plans, failed to exercise the care, skill, prudence, and diligence that a prudent person would when acting in like capacity and familiar with such matters;

xi. Caused and/or allowed fees and expenses to be paid by the Plans for purposes other than those allowed by ERISA;

xii. By the conduct above and/or by other conduct set forth in this Complaint, revealed in discovery and/or proven at trial, breached their fiduciary and other ERISA-imposed obligations to the Plans, participants and beneficiaries of the Plans, and members of the classes;

xiii. Are liable to the Plans and the Classes for losses suffered as a result of the breaches of their fiduciary duties and other ERISA-imposed obligations; and

xiv. Are responsible to account for the assets and transactions of the Plans and should be charged for any transactions and payments for which they cannot account.

C. **Typicality.** The claims brought by the Plaintiffs are typical of those of the absent class members because:

i. The Defendants owed the exact same fiduciary and other ERISA-based obligations to each participant in the Plans and each member of the Classes;

ii. The Defendants' breach of those obligations constitutes a breach as to each participant and each member of the Classes;

iii. To the extent that there are any differences among class members' damages, such differences would be a product of simple mathematics based upon their account balances in the Plans. Such minimal and

formulaic differences are no impediment to class certification.

D. **Adequacy of Representation.** The Plaintiffs are adequate representatives of the absent class members and will protect such absent class members' interests in this litigation. The Plaintiffs do not have any interests antagonistic to the other class members nor do they have any unique claims or defenses that might undermine the efficient resolution of the classes' claims. Plaintiffs have retained competent counsel, versed in ERISA, class actions, and complex litigation.

47. Class certification is also appropriate under Rule 23(b) and each subpart because:

A. Pursuant to Rule 23(b)(1)(B), in the absence of certification, there is a risk of inconsistent adjudications with respect to individual class members;

B. Pursuant to Rule 23(b)(2), as set forth above, the Defendants have acted on grounds generally applicable to each class as a whole;

C. Pursuant to Rule 23(b)(3), as set forth above, common issues of law and fact predominate over any purely individual issues and thus a class action is superior to any other method for adjudicating these claims.

## FACTS

### The Plans

48. Northrop Grumman offers certain of its employees the opportunity to participate in the NGS Plan and the FSS Plan as part of their compensation and benefits.

49. The NGS Plan is a "defined contribution plan," as defined in ERISA § 3(34), 29 U.S.C. § 1002(34), and contains an employee stock ownership plan provision. It is a tax-qualified plan of the type popularly known as a "401(k) plan."

50. Like the NGS Plan, the FSS Plan is a defined contribution plan containing an employee stock ownership plan provision and is a tax-qualified 401(k) plan.

51. Northrop Grumman benefits from its sponsorship of the Plans because the opportunity to participate in the Plans enhances its ability to recruit

and retain qualified personnel, fosters employee loyalty and goodwill, and entitles Northrop Grumman to tax advantages under the Internal Revenue Code.

52. Under the terms of the NGS Plan, qualified employees may contribute a percentage of their before-tax earnings to the NGS Plan. Northrop Grumman will make company contributions and will also make matching contributions in varying percentages of the employees' eligible compensation. The same is true of the FSS Plan. Participants are 100 percent vested in their account, including the matching and discretionary contribution portion, with some exceptions for employees who were not vested under a prior plan.

53. Each participant's account is credited with the participant's contributions, the participant's share of matching and discretionary contributions, and the Plans' earnings.

54. Both the NGS and the FSS Plans operate in connection with a master trust, the Northrop Grumman Defined Contributions Master Trust.

55. A "master trust" is a separate trust entity established by an employer or group of related employers to provide investment and administrative services to 401(k) plan or plans. Plan sponsors and administrators generally utilize master trusts in seeking to achieve efficiency or economies of scale in administering multiple 401(k) plans for an employer or

related-employer group (*e.g.* a company or related companies that maintain both a salaried and an hourly employee plan; plans formerly sponsored or administered by a company which the employer acquired and/or with whom the employer merged).

56. Through a master trust structure, several 401(k) plans may invest in common investment options or funds offered in the master trust and may share the services of master trust record-keepers, investment managers, consultants, and other service providers. The fees incurred for such services typically are allocated among participating plans based upon each plan's proportionate share of the assets in the master trust.

57. The same is true here. The Master Trust holds the assets of all of Northrop Grumman's retirement plans, including the NGS Plan and the FSS Plan. All of the plans in the Master Trust share the services of record keepers, investment managers and other providers. The fees for these services are allocated on a pro rata basis among the plans.

58. Participating employees may choose to invest NGS Plan or FSS Plan contributions in any of 12 investment options. Eleven of those options are "collective trusts" created at the direction of the Administrative Committee

and/or the Investment Committee and/or the ITA for the benefit of the NGS Plan and the FSS Plan. Those options are

A. U.S. Equity Fund;

B. U.S. Fixed Income Fund;

C. Stable Value Fund;

D. Balanced Fund;

E. International Equity Fund;

F. Small Cap Fund;

G. Equity Index Fund;

H. High-Yield Bond Fund;

I. International Bond Fund; and

J. Emerging Markets Fund.

59. The Administrative Committee and/or the Investment Committee and/or the ITA selected the investment managers that operate the funds, subject to the oversight of the Compensation Committee and Board of Directors. Each of the eleven funds has a specific investment strategy, developed by the Committees or the ITA.

60. The Plan also offers participants the option of investing in the Northrop Grumman Fund, a fund that holds Northrop Grumman Corporation common stock.

61. As noted above, all of these funds are held in the Northrop Grumman Defined Contribution Plans Master Trust. Each fund is itself held in a trust within the Master Trust. State Street Corporation is the Trustee for the Master Trust and for the fund trusts.

62. By the end of 2005, the Master Trust had more than $11 billion in assets. The NGS Plan's assets comprise approximately 90% of the assets in the Master Trust. The FSS Plan's assets comprise approximately between 7% and 10% of the assets in the Master Trust.

**Northrop Grumman's Fiduciary Duties Owed To The Plan Under ERISA**

63. ERISA §403(c)(1), 29 U.S.C. §1103(c)(1), unambiguously mandates that:

> [T]he assets of a plan shall never inure to the benefit of any employer and shall be held for the **exclusive purposes of providing benefits** to participants in the plan and their beneficiaries **and defraying reasonable expenses of administering the plan.**

(Emphasis added).

64. ERISA §§ 404(a)(1)(A)&(B) of ERISA, 29 U.S.C. § 1104(a)(1)(A) & (B), require that the Plan's fiduciaries "shall discharge [their] duties with respect to a plan solely in the interest of the participants and beneficiaries" and:

> A. F]or the exclusive purpose of:
> i. providing benefits to participants and their beneficiaries; and
> ii. defraying reasonable expenses of administering the plan;
>
> and
>
> B. [W]ith the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

65. ERISA § 405(a), 29 U.S.C. § 1105(a), provides that one fiduciary may be held liable for breaches of fiduciary duty committed by another fiduciary where

> (1) the fiduciary "participates knowingly in or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach";
>
> (2) the fiduciary, by his or her "failure to comply with section 1104(a) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary" enables "such other fiduciary to commit such a breach"; or

> (3) the fiduciary "has knowledge of a breach by such other fiduciary," and does not make "reasonable efforts under the circumstances to remedy the breach."

66. ERISA § 406, 29 U.S.C. § 1106, prohibits certain transactions between the Plan and "parties in interest." This section provides that unless subject to an exemption as set forth in ERISA § 408, 29 U.S.C. § 1108, a fiduciary

> shall not cause the plan to engage in a transaction, … if he knows or should know that such a transaction constitutes a direct or indirect – sale or exchange, or leasing, of any property between the plan and a party in interest; … furnishing of goods, services or facilities between the plan and a party in interest … transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan. 29 U.S.C. § 1106(a)(1).

67. For purposes of section 406, a "party in interest" is any plan fiduciary, including the plan administrator, trustee, officer or custodian, any plan services provider, the employer, a relative of any of the above, and certain persons with ownership or leadership roles in any of the above. ERISA § 3(14), 29 U.S.C. § 1002(14).

68. Similarly, a fiduciary (1) shall not "deal with the assets of the plan in his own interest or for his own account"; (2) shall not "act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interest of the plan" or its participants and beneficiaries; and (3)

shall not "receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan." 29 U.S.C. § 1106(b).

69. ERISA §104(b)(1), 29 U.S.C. § 1024(b)(1), requires that the Plan Administrator periodically provide to Plan participants and beneficiaries a summary plan description ("SPD").

70. ERISA §104(b)(3), 29 U.S.C. § 1024(b)(3), requires that the Plan Administrator at least annually provide to Plan participants and beneficiaries copies of statements and schedules from the Plan's annual report for the previous year, and such additional information " as is necessary to fairly summarize the latest annual report."

71. The schedules and statements that the Plan Administrator annually must provide to Plan participants and beneficiaries specifically include:

> [A] statement of the assets and liabilities of the plan aggregated by categories and valued at their current value, and the same data displayed in comparative form for the end of the previous fiscal year of the plan; and
>
> [A] statement of receipts and disbursements during the preceding twelve-month period aggregated by general sources and applications.

ERISA §103(b)(3), 29 U.S.C. §1023(b)(3).

72. ERISA §104(b)(4), 29 U.S.C. § 1024(b)(4), entitles Plan participants and beneficiaries to receive more detailed information from the Plan Administrator on request.

73. ERISA §103(b)(2)&(3), 29 U.S.C. §1023(b)(2)&(3) mandates that, among other extensive disclosures, Plan fiduciaries must include in the Plan's "Annual Report" is a statement of [the Plan's] assets and liabilities, and a statement of changes in net assets available for plan benefits which shall include details of revenues and expenses and other changes aggregated by general source and application.

> The administrator shall, upon written request of any participant or beneficiary, furnish a copy of the latest updated summary, plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated.

74. ERISA § 404(c) provides to Plan fiduciaries a "safe harbor" from liability for losses that a participant suffers in their 401(k) accounts to the extent that the participant exercises control over the assets in his or her 401(k) accounts. To be eligible for the protection of this "safe harbor," plan fiduciaries must, among other things, provide:

> an opportunity for a participant or beneficiary to exercise control over assets in his individual account," and must provide "a participant or beneficiary with an opportunity to choose, from a

> broad range of investment alternatives, the manner in which some or all of the assets in his account are invested.

29 C.F.R. §2550.404c-1(b)(1).

75. For a participant or beneficiary to be deemed to have "an opportunity to exercise control over assets in his individual account" within the meaning of 404(c), the plan fiduciaries must provide him or her with "the opportunity to obtain sufficient information to make informed decisions with regard to investment alternatives under the plan." 29 C.F.R. §2550.404c-1(b)(2)(B).

76. The "sufficient investment information" that plan fiduciaries must provide to participants includes:

> A description of any transaction fees and expenses which affect the participant's or beneficiary's account balance in connection with purchases or sales of interests in investment alternatives (e.g., commissions, sales load, deferred sales charges, redemption or exchange fees)

29 C.F.R. §2550.404c-1(b)(2)(i)(B)*(1)(v)*.

It must also include, at least upon request,

> A description of the annual operating expenses of each designated investment alternative (e.g., investment management fees, administrative fees, transaction costs) which reduce the rate of return to participants and beneficiaries, and the aggregate amount of such expenses expressed as a percentage of average net assets of the designated investment alternative.

29 C.F.R. §2550.404c-1(b)(2)(i)(B)(*2)(i)*.

77. ERISA's safe harbor regulations state that the imposition of *reasonable* charges for *reasonable* plan expenses does not interfere with a participant's opportunity to exercise control over his/her individual account so long as *plan fiduciaries inform the participant* of such actual expenses:

> A plan may charge participants' and beneficiaries' accounts for the reasonable expenses of carrying out investment instructions, *provided that procedures are established under the plan to periodically inform such participants and beneficiaries of actual expenses incurred with respect to their respective individual accounts.*

29 C.F.R. §2550.404c-1(b)(2)(ii)(A) (emphasis added).

## The Fees and Expenses Assessed Against The Plans

78. The Defendants, directly or indirectly, have caused the Plans to purchase services from various plan service providers, including trustee, record-keeping, administration, investment advisory, investment management, brokerage, insurance, consulting, accounting, legal, printing, mailing, and other services.

79. Either directly or through the Master Trust, the Defendants have caused the amounts that the Plans pay for these services to be assessed against participants' accounts.

80. Either directly or through the Master Trust, the Defendants have caused or allowed these services providers to receive payment in at least one of two ways:

A. By direct disbursement from the Plan or the Master Trust to the entity providing the service; and/or

*B.* By receiving, or having the opportunity to receive, "Revenue Sharing" payments comprised of Plan assets distributed between and/or among various service providers.

**Investment Management and Administrative Charges in 401(k) Investment Alternatives**

81. In order to help participants diversify their savings, ERISA requires that 401(k) plans offer participants at least three investment options into which they may direct their contributions. The options can consist of any type of investment – stocks, bonds, U.S. based companies, international companies, large companies, small companies, or combinations of two or more of the above. The Plans, for example, offer 12 such options, as set forth above.

82. Most 401(k) plans offer participants the opportunity to invest in "pooled" investment vehicles – mutual funds, common collective trusts, guaranteed investment contracts, variable annuity contracts (hereinafter collectively "Funds") – each of which invests in a portfolio of stocks, bonds

and/or other securities. The Plans have used collective trusts as the investment vehicle with which to attempt to accomplish diversification, for example.

83. The diversified investment options should carry varying degrees of risk. A stable value investment option, for example, seeks to offer a steady, but relatively low rate of return in exchange for a low risk of loss. An "emerging markets" investment option, investing in companies from the developing world, is considered significantly riskier, but also offers the potential of a higher rate of return.

84. These Funds charge various fees to 401(k) plans. Most Funds, for example, charge for investment management, administration, record-keeping, accounting, and legal fees. These fees are subtracted from investors' fund balances.

85. As a result, when a Fund reports its investment performance to investors, it does so "net" of fees and expenses. In any reporting period (a month, quarter, or year), an investor's balance will be based upon: the amount of principal invested plus (or minus) an investment gains (losses) and minus the fees charged against the account.

## Benchmarks, Indices, and Investment Management

86. Investment managers are finance industry professionals who manage the assets in a Fund. They select the securities and other investments that the Fund buys and sells to fulfill its objectives.

87. The Plans pay investment management fees to investment managers for these services. Typically, these investment management fees are disclosed to participants as part of the Fund's expense ratio and subtracted from participants' accounts before the returns from any particular period are reported. The collective trusts in the Plans do so here, reporting returns "net" of fees.

88. To measure the performance of the investment manager, a Fund will compare its returns to the performance of a "benchmark." A benchmark is, or at least should be, an established and publicly available index that objectively reports the performance of a selected mix of securities.

89. An index is essentially "an imaginary portfolio of securities representing a particular market or a portion of it." The "S&P 500" is probably the best-known index. It consists of 500 stocks believed to represent the U.S. large company market. A Fund holding shares of stock in the largest U.S. companies would use the S&P 500 as a benchmark or standard against which to measure its performance.

90. Obviously, selecting an appropriate benchmark is crucial in measuring the performance of an investment manager or Fund.

91. To be an honest and accurate measure of a Fund's performance, a benchmark must conform to the same investment style or objective (*i.e.* embrace similar level of risk and with the anticipation of a similar return) as the Fund.

92. Thus, the S&P 500 Index may be an appropriate benchmark for a large cap stock Fund (which embraces a similar level of risk in anticipation of a similar return to that of S&P 500 stocks), but would be wholly inappropriate as a benchmark for a small cap fund (which invests in smaller companies without the track records of S&P 500 corporations, seeking higher returns and embracing more risk).

93. So, in presenting a benchmark against which to measure a Fund's performance or fees, plan fiduciaries must compare apples to apples

94. This is especially true in the complex arena of 401(k) plan investing: While plan participants easily would discern the obvious differences between an apple benchmarked against an orange, they would be markedly less likely to appreciate a plan fiduciary inclusion of an inappropriate stock in a large cap Fund that, while increasing the Fund's return, subjects it to an incompatible level of risk.

95. Here, in the NGS and FSS Plans, the Defendants have done exactly that. The U.S. Equity Fund, a large cap fund, invests in securities that are of a different and higher-risk category than those found in its benchmark. Although investment in these securities enhanced the fund's returns, it did so at increased – and undisclosed –risk to the NGS Plan and FSS Plan participants and beneficiaries.

## Active v. Passive Investment Management

96. A Fund will usually employ one of two broad investment management approaches to meet its investment objective: "active management" or "passive management."

97. "Active management" is an investing strategy that seeks returns in excess of a specified benchmark. If a Fund is "actively managed," the investment manager will independently select, purchase, and sell securities for the Fund in an effort to outperform the Fund's benchmark to "beat the market."

98. The return on an actively managed Fund is based upon the performance of the Fund's securities, selected by the manager, and is reduced by the Fund's expense ratio. The largest portion of the expense ratio is investment management fees. Because active management involves, or at least should

involve, the investment manager's exercise of expert knowledge, skills, and judgment, investment managers are paid well for their services.

99. By contrast, "passive management" is an investing strategy that mirrors the performance of an index, instead of attempting to "beat the market." It does not involve the independent selection of securities for the Fund, but rather the selection of securities of the same type and in relatively the same proportion as the holdings of the Fund's benchmark, which is the index against which the Fund measures its performance. Because passive management does not involve the same level of exercise of expert knowledge, skill, and judgment as active management; passively managed Funds do not charge the same amount of investment management fees as actively managed Funds.

100. An "index fund" is an example of a passively managed fund. It generally seeks to purchase, sell, and hold the same securities as the benchmark index against which its performance is measured.

101. As a result, an index fund largely will duplicate the benchmark's return.

**"Closet" or "Shadow" Index Funds That Charge For Active Management**

102. Because an actively managed Fund relies upon the skills and judgment of its investment manager to select holdings, with the goal of beating

its benchmark, the fund will charge higher investment management fees than a similar fund that is passively managed.

103. In exchange for these substantially higher fees, actively managed Funds are *supposed to* provide higher returns for their investors than passively managed index Funds. Actively managed Funds are supposed to provide these larger returns by cleverly selecting securities, compatible with the stated investment style (*i.e.* by embracing similar level of risk) that will outperform the securities comprising the benchmark.

104. However, some Funds that claim to be actively managed, and that charge investment management fees for active management, are structured and/or behave more like index funds. These are known as "closet" or "shadow" index funds.

105. A shadow index fund is one in which 95% or more of the variation in the Funds' investment gains and losses is correlated statistically to such variations in the benchmark against which the Fund measures its performance. In other words, the investment gains and losses in a shadow index fund very closely correspond to those of a passively managed index fund tied to the same benchmark.

106. Shadow indexing is a strategy used by some Fund investment managers to achieve returns similar to those of their benchmark index, without exactly replicating the index. Such an investment manager may stick to an index in terms of weighting, industry sector or geography, while not selecting the exact stocks as the index or otherwise may seek to substantively replicate the index without directly copying it.

107. Shadow or closet indexing also occurs when the investment manager[s] of a Fund attempt to beat the market while investing in so many different securities that their portfolio is broadly distributed across the market and becomes a *de facto* mirror of the index representing the market.

108. A shadow index fund does not necessarily hold itself out as such. Like any other Fund charging active management fees, shadow index funds boast of their investment management expertise and how it is employed to beat the market.

109. While investors in shadow index funds pay active investment management fees on 100 percent of the dollars they invest in the Fund, only a small portion (usually less than 5 percent) of the Fund's returns can be attributed to active management.

110. In the NGS Plan and the FSS Plan, nine of the eleven investment options – all but the Northrop Grumman Stock Fund and the Equity Index Fund – claim to be actively managed. However, all of these allegedly actively managed funds for which there is an appropriate benchmark have been shadow index funds for a large portion of the last six years.

111. The NGS and FSS fiduciaries selected these investment options, and described them as "actively managed" in communications with participants in the Plans. In fact, the documentation provided to participants and beneficiaries even contains an explanation of the difference between active and passive management. However, participants in the Plans who invested in such shadow index funds are charged and forced to pay active management level fees and expenses; fees and expenses that are unreasonable, excessive, and not incurred solely for their benefit.

112. The NGS Plan and the FSS Plan (and their participants and beneficiaries) paid active management rates to the investment managers instead of the significantly lower index fund rates those same investment managers or others would charge, had the fiduciaries requested it. In fact, in part because of the higher fees, the funds generally underperformed their benchmarks.

113. The only fund to exceed its benchmark – the U.S. Equity Fund – did so only because it selected an improper and misleading benchmark for comparison.

**Investment Management and Other Fees Assessed Against Employer Stock Funds**

114. Employer stock funds or company stock funds ("Employer Stock Fund") are an investment option in many 401(k) plans, especially those of large employers with stock that is publicly traded on recognized stock exchanges.

115. The Northrop Grumman Fund provides participants in the Plans with the opportunity to use a portion of their 401(k) retirement savings to purchase stock in the company for which they work.

116. By their nature, Employer Stock Funds, like the Northrop Grumman Fund, are undiversified and risky, especially when they represent a disproportionately high percentage of a 401(k) plan participant's account.

117. While such Funds benefit employers by providing a steady market for the employer's stock and millions – or often billions – of dollars in working capital from their employees' salaries, Employer Stock Funds cause 401(k) participants to embrace the risks inherent in undiversified investing.

118. For the typical 401(k) participant, the risk that such undiversified Employer Stock Fund imposes is greater than that of other undiversified investments.

119. The typical 401(k) participant – before placing any retirement savings in an Employer Stock Fund – relies on the stability and financial viability of his/her employer as the basis of his/her standard of living: the participant's present salary, healthcare and other benefits, as well as his/her pension (if any) and retirement health insurance depend upon the employer's continued solvency and viability.

120. Thus, the same risk that could impair the participant's investment in the Employer Stock Fund – the failure or insolvency of the employer – would also cause the loss of current income and benefits and future non-401(k) retirement benefits. The risks are correlated and, if realized, would financially devastate most employees and 401(k) plan participants.

121. Recent high-profile corporate scandals highlight the risks inherent in 401(k) participants' investment in Employer Stock Funds.

122. Purportedly countering these concerns, plan fiduciaries who establish and administer Employer Stock Funds, including the Northrop Grumman Fund, suggest that employees' ownership of employer stock increases

the employees' concern for the financial well-being of the employer, fosters a feeling of ownership of and identification with the employer, and enhances productivity.

123. Regardless of the risks and benefits inherent in Employer Stock Funds, from a fee and expense standpoint, they *should be* a low cost 401(k) plan investment alternative.

124. Employer Stock Funds do not need to pay for investment management, which constitutes the largest portion of most Funds' fees and expenses and thus the largest portion of Funds' expense ratio. By their very nature, Employer Stock Funds forgo such investment management and hold an undiversified portfolio containing employer stock. Therefore, Employer Stock Funds should not charge investment management fees.

125. It is crucial to participants' returns that plan fiduciaries ensure that there are no expenses assessed against participants' savings in Employer Stock Funds, or, if any, that they be as minimal as possible, *and* the Employer Stock Fund does not hold cash of any significance on a continuous basis.

126. However, over the last six years, the Northrop Grumman Fund required participants to pay an asset-based fee for "investment-related expenses," charged against returns on the stock. Because the Northrop

Grumman Fund could by definition invest only in Northrop Grumman common stock, there was no managing of investments to be done. The fund simply bought or sold shares of one stock. There was no reason to charge any investment–related fee at all.

127. Similarly, for much of the last six years, the Northrop Grumman Fund had unusually high administrative expenses. Like the investment fee, the administrative fees were charged against the returns on the stock, reducing the participant or beneficiary's return. There was no reason for the administrative fees to be as high as they were since the Fund was investing only in shares of one stock.

128. Plaintiffs and other participants invest in the Northrop Grumman Fund with the goal of sharing in their employer's financial success through the receipt of dividends and/or the increase in the value of Northrop Grumman stock.

129. NGS and FSS Plan participants who invest in the Northrop Grumman Fund do not own shares of their employer's stock. They own units of the Fund.

130. Each unit represents a portion of the shares of employer stock in the Fund and a portion of the cash held in the Fund, which could be as much as 5%.

131. The value of each Northrop Grumman Fund unit is and has been reduced by the fees and expenses assessed against the assets in the Fund and by the cash – rather than Northrop Grumman stock – that the Fund holds.

132. As a result, the return of the Plans' participants receive on their investment in the Northrop Grumman Fund is, and has been, in general, lower than that of an investor holding a portfolio of pure employer stock outside of the Plans.

133. Because the Northrop Grumman Fund holds cash, the amount of cash reduces the extent to which the Plans' participants share in their employers' financial success.

134. When the value of Northrop Grumman's stock rises, or when it pays dividends, participants who place their retirement savings in the Northrop Grumman Fund naturally want *every* dollar they save to earn such investment gains.

135. But, any portion of the participant's savings that remains in cash, and is not used to purchase the employer's securities, does not generate such investment gains. Instead, its value remains essentially the same.

136. For example, if a *non-401(k) investor* purchases 100 shares of the Northrop Grumman Fund at $100 per share, and the share value thereafter rises by 10%, he or she has reaped a $1000 gain on the initial $10,000 investment.

137. However a participant in the Plans placing the same $10,000 in an the Northrop Grumman Fund does not receive 100 shares of the employer stock. He or she receives Fund units representing an interest in the shares of employer stock held in the Fund *and* an interest in the Fund's cash.

138. If the Northrop Grumman Fund holds 4% cash and 96% employer stock, the 10% increase in the value of the employer stock will translate into a $960for the plan participant, instead of the $1000 earned by the non-Plan investor. The value of the cash in the Northrop Grumman Fund remains static.

139. In this example, to make matters worse, the participant in the Plans investing $10,000 in the Northrop Grumman Fund, will also have to pay substantial fees and expenses. These fees and expenses will further reduce his or her return.

140. While this difference may seem modest, the Northrop Grumman Fund is one of the largest of investment alternatives available to participants, containing more than $1.3 billion participant dollars.

141. Plan participants' returns in the Northrop Grumman Fund have substantially underperformed those of complete strangers to the Company investing outside of the Plans.

142. The Defendants have failed, and continues to fail to disclose and explain to participants of the Plans that the returns participants receive on employer stock in the Northrop Grumman Fund are lower than those enjoyed by complete strangers to the company.

143. The Defendants obscure this fact in a variety of ways. For example, in fact sheets provided to participants, charts and graphs compare the performance of the Northrop Grumman Fund to the S&P 500, but do not make a similar comparison between the performance of the Northrop Grumman Fund and the performance of Northrop Grumman stock.

144. The Defendants violated their fiduciary obligations under ERISA: (A) by maintaining and holding, causing to be maintained or held, and/or allowing to be maintained or held, excess cash in the Northrop Grumman Fund and thereby impairing participants' returns and (B) by causing or allowing excessive fees and expenses to be assessed against participants' accounts in the Northrop Grumman Fund.

**Defendants' Non-Compliance with §404(c)'s Safe Harbor Requirements and Concealment of Their Fiduciary Breaches**

145. As set forth above, the Defendants did not disclose, and to this day have not disclosed, the fact that plan service providers were and/or are engaging in closet indexing, and that the Northrop Grumman Fund was underperforming Northrop Grumman stock purchased outside of the NGS and FSS Plans.

146. Participants in the Plans did not have, and do not have, complete and actual knowledge of the fees and expenses being charged to the Plans that reduced their account balances.

147. Thus, the Plans' fiduciaries, including the Defendants, have not told participants in the Plans, and participants in the Plans do not know:

a. the "annual operating expenses" of the investment options in the Plans, as required by 29 C.F.R. §2550.404c-1(b)(2)(i)(B)*(2)(i)*; and

b. the actual expenses incurred with respect to their respective individual accounts, as required by 29 C.F.R. §2550.404c-1(b)(2)(ii)(A).

148. As a result of the Defendants' failure and refusal to provide such information, and the general failure on the part of the Plans' fiduciaries to

disclose the actual expenses in the Plans, the participants have not been provided with "the opportunity to obtain sufficient information to make informed decisions with regard to investment alternatives under the plan." 29 C.F.R. §2550.404c-1(b)(2)(i)(B).

149. Because the Defendants failed and refused to provide them with this information, and concealed this information from them, the participants and beneficiaries have lacked the information necessary to understand and protect their interests in the Plans and/or to have knowledge of the Defendants' breaches of fiduciary duty.

150. In fact, in their fiduciary rules, Defendants are the parties with the information necessary to know and understand whether the participants' rights and protections under ERISA are being, or have been, violated.

151. Defendants have an affirmative obligation to provide full and accurate information to the participants regarding the administration of the Plans.

152. Defendants' silence and/or non-disclosure in the face of such a duty to disclose is tantamount to an affirmative misrepresentation.

153. Here, despite the Defendants' duty to disclose full and accurate information regarding the fees and expenses assessed against participants'

accounts, on an ongoing basis Defendants failed and refused to disclose to, and inform the participants of:

a. the total amount of fees and expenses reasonable and necessary to operate the Plans;

b. the total amount of amount of fees and expenses the Plans actually paid to service providers in the form of Hard Dollar payments and Revenue Sharing;

c. the availability of Revenue Sharing;

d. the true and accurate details regarding the revenues and expenses of the Plans;

e. the true and accurate operating expenses which reduce participants' returns, including both Hard Dollar payments and Revenue Sharing, for each of the Plans' investment alternatives;

f. the true and accurate transaction fees and expenses which affect the participants' account in connection with the purchase or sale of investment alternatives;

g. the amount, when both Hard Dollar Payments and Revenue Sharing are considered, by which the Plans' expenses exceeded

those which were reasonable and incurred solely in participants' interests; and

h. other revenue and expense information necessary for the participants to understand and protect their interests in the Plans.

154. Based upon the foregoing, Defendants are not entitled to the safe harbor protections of ERISA § 404 (c).

155. Based upon the foregoing, the statue of limitations was tolled on the breaches set forth in this Complaint and did not begin to run until such time as Plaintiffs actually discovered them.

## COUNT I:
## Breach of Fiduciary Duty – ERISA §502(a)(2)

156. Plaintiffs restate and incorporate the allegations contained in paragraphs 1 through 155 as though fully set forth here.

157. As set forth in detail above, the Defendants owe the Plans, their participants and beneficiaries, and the Classes extensive fiduciary duties including, without limitation:

A. To conduct themselves as fiduciaries to the Plans with the care, skill, prudence, and diligence under the circumstances then

prevailing that a prudent ERISA professional fiduciary would in operating and administering a 401(k) plan the size and character of the Plans;

B. To perform their fiduciary duties with the utmost loyalty and fidelity to the Plans and their participants and beneficiaries, avoiding at all times conflicts of interest, self-interest, and duplicity;

C. To ensure, at all times, that assets of the Plans "shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the Plans and their beneficiaries and defraying reasonable expenses of administering the Plans";

D. To track and account for all transactions involving the Plans and their assets so as to ensure that the assets are retained, managed, and disbursed in compliance with the Plan Documents and ERISA;

E. To track and account for all transactions involving the Plans and the Plans' assets so as to ensure that the assets "never inure to the benefit of any employer and shall be held for the exclusive

purposes of providing benefits to participants in the Plans and their beneficiaries and defraying reasonable expenses of administering the Plans";

F. To ensure that the fees and expenses incurred by the Plans are reasonable and incurred for the sole and exclusive benefit of participants and beneficiaries of the Plans;

G. In entering into agreements with service providers to the Plans , to ensure that the payments from the Plans – whether they are direct or indirect – are reasonable for the services provided and made for the sole and exclusive benefit of participants and beneficiaries of the Plans;

H. In operating and administering the Plans, to establish, implement, and follow procedures to properly and prudently determine whether the fees and expenses paid by the Plans were reasonable and incurred solely for the benefit of participants of the Plans;

I. In operating and administering the Plans, on an ongoing basis to monitor the payments made by the Plans to service providers – whether they are direct or indirect – are and remain reasonable

for the services provided and made for the sole and exclusive benefit of participants and beneficiaries of the Plans;

J. To inform themselves of, and understand, the various methods by which vendors in the 401(k) industry collect payments and other revenues from 401(k) plans;

K. To inform themselves of trends, developments, practices, and policies in the retirement, financial investment and securities industry which affect the Plans, and to remain aware and knowledgeable of such trends, practices and policies on an ongoing basis;

L. To communicate with participants and beneficiaries of the Plans regarding the Plans honestly, clearly and accurately;

M. To affirmatively and without request provide participants and beneficiaries of the Plans with honest, accurate and complete information they need to understand their investments in the Plans; the management, risk, potential returns of such investments, and the fees and expenses incurred in connection with those investments;

N. Upon request, to provide further any information to participants and beneficiaries of the Plans regarding the operation and administration of the Plans and the expenses incurred in doing so; and

O. To provide honest, accurate and complete information to participants and beneficiaries in the Plans regarding the costs associated with their various investment choices and directions;

P. To appoint fiduciaries who were capable of living up to their fiduciary duties, to monitor and oversee those fiduciaries in the performance of their duties, and to remove any fiduciaries who breached their fiduciary duties.

158. As set forth in detail above, the Defendants breached their fiduciary obligations to the Plans, participants and beneficiaries in the Plans and the members of the NGS and FSS Classes by, among other conduct to be proven at trial:

A. Causing the Plans to enter into agreements with service providers under which the Plans pay/paid – directly or indirectly – fees and expenses that were, or are, unreasonable

and/or not incurred solely for the benefit of participants and beneficiaries of the Plans;

B. Allowing the Plans to pay – directly or indirectly – fees and expenses that were, or are, unreasonable and/or not incurred solely for the benefit of participants and beneficiaries of the Plans;

C. Failing to monitor the fees and expenses paid by the Plans and, by such failure, causing and/or allowing the Plans to pay fees and expenses that were, or are, unreasonable and/or not incurred solely for the benefit of participants and beneficiaries of the Plans;

D. Failing to inform themselves of trends, developments, practices, and policies in the retirement, financial investment and securities industry which affect the Plans; and failing to remain aware and knowledgeable of such trends, practices and policies on an ongoing basis;

E. Failing to inform themselves of, and understand, the various methods by which vendors in the 401(k) industry collect payments and other revenues from 401(k) plans;

F. Failing to establish, implement, and follow procedures to properly and prudently determine whether the fees and expenses paid by the Plans were reasonable and incurred solely for the benefit of participants and beneficiaries of the Plans;

G. Failing to communicate with participants and beneficiaries of the Plans regarding the Plans honestly, clearly and accurately;

H. Failing properly to inform and/or disclose to participants and beneficiaries of the Plans the fees and expenses that are, or have been, paid by the Plans;

I. Failing to inform and/or disclose to participants and beneficiaries of the Plans in proper detail and clarity the transactions, fees and expenses which affect participants' accounts balances in connection with the purchase or sale of interests in investment alternatives;

J. Failing to discover, disclose and stop the charging of hidden and excessive fees to the Plans;

K. Failing to appoint fiduciaries who lived up to their fiduciary duties, failing to monitor and oversee those fiduciaries in the

performance of their duties, and failing to remove any fiduciaries who breached their fiduciary duties;

L. By the foregoing conduct, failing to exercise the care, skill, prudence and diligence that a prudent person would when acting in like capacity and familiar with such matters.

159. As set forth in detail above, as a result of these breaches, Plaintiffs, the NGS and FSS Classes, the Plans, and the participants and beneficiaries of the Plans have suffered financial losses and damages.

160. Further, as set forth in detail above, the Defendants failed to provide participants and beneficiaries with sufficient investment information to qualify for the safe harbor immunity of section 404(c). Accordingly, the Defendants are liable for participants and beneficiaries' investment losses in the Plans.

161. Pursuant to ERISA § 409, 29 U.S.C. § 1109, and ERISA § 502(a), the Defendants are liable to restore to the Plans the losses they experienced as a direct result of the Defendants' breaches of fiduciary duty and is liable for any other available and appropriate equitable relief, including prospective injunctive relief and declaratory relief, and attorney's fees.

**COUNT II:**
**Other Remedies for Breach of Fiduciary Duty – ERISA §502(a)(3)**

162. Plaintiffs restate and incorporate the allegations contained in paragraphs 1 through 161 as though fully set forth here.

163. As an alternative to the causes of action stated in Count I, Plaintiffs seek further relief pursuant to ERISA § 502(a)(3), 29 U.S.C., § 1132(a)(3).

164. Under section 502(a)(3), a participant may enjoin any act which violates ERISA or may obtain other appropriate equitable relief to redress such violations or enforce the terms of ERISA.

165. The Defendants, as fiduciaries of the Plans, occupy a position of trust and confidence in connection with the Plans, the Plans' assets, and participants and beneficiaries of the Plans.

166. The Defendants have exclusive discretion and control over the Plans' assets and are strictly obligated to exercise that control "for the exclusive purposes of providing benefits to participants in the Plan[s] and their beneficiaries and defraying reasonable expenses of administering the Plan[s]."

167. Although *only* participants and beneficiaries are entitled to the Plans' assets and to the benefit of the Plans' assets, in the absence of full and candid disclosure from the Defendants, participants and beneficiaries of the

Plans do not know, and have no means of knowing, how their assets have been managed and disbursed.

168. Accordingly, the Defendants occupy the position of a common law trustee in connection with the Plans, their assets, and their participants and beneficiaries.

169. As set forth in detail above, the Defendants have caused and/or allowed the plan to pay – directly or indirectly – excess fees and expenses to the Plans' service providers.

170. The Defendants, and not the Plaintiffs, have and/or should have specific and detailed information regarding how the Plans' assets have been treated and disbursed in this regard.

171. Accordingly, the Court should order that the Defendants render an accounting of all transactions, disbursements and dispositions occurring in, in connection with, and/or in respect of, the Plans and their assets.

172. Plaintiffs respectfully request that the Court order that such an accounting include, without limitation, detailed and specific information regarding all fees and expenses incurred by the Plan and/or paid to third parties, whether paid directly by the Plans or indirectly transferred among plan service providers or other third parties.

173. Plaintiffs respectfully request that, to the extent that the Defendants do not or cannot account for all such transactions and their propriety under ERISA, the Plan Document and other applicable law, the Court surcharge against the Defendants all amounts for which they cannot account.

174. Plaintiffs further seek injunctive and other appropriate equitable relief to redress the wrongs described above, and to cause them to cease in order for the Plans' participants and beneficiaries to receive the full benefit of their retirement savings in the future.

WHEREFORE Plaintiffs, on behalf of the Plans and all similarly situated participants and beneficiaries of the Plans, respectfully request that the Court:

- find and declare that the Defendants have breached their fiduciary duties as described above;
- order the Defendants to make good to the Plans all losses that the Plans incurred as a result of the conduct described above and to restore the Plans to the position each would have been in but for the breaches of fiduciary duty;
- impose a constructive trust on any monies by which the Defendants were unjustly enriched as a result of their breaches of fiduciary duty

and/or cause the Defendants to disgorge such monies and return them to the Plan;

- remove the fiduciaries who have breached their fiduciary duties and/or enjoin them from future breaches of ERISA;
- award actual damages to the Plans in the amount of their monetary losses;
- require Defendants to render an accounting as set forth above;
- surcharge against Defendants and in favor of the Plans all amounts involved in transaction which such accounting reveals were or are improper, excessive and/or in violation of ERISA;
- permanently enjoin Defendants from breaching their fiduciary duties in each respect set forth in the Complaint;
- order costs and attorneys fees pursuant to ERISA § 502(g) and the common fund doctrine;
- order equitable restitution or other available equitable relief against the Defendants;
- order the payment of interest to the extent it is allowed by law; and
- grant any other and further relief the Court deems appropriate.

**PLAINTIFFS DEMAND A TRIAL BY JURY OF ALL COUNTS SO TRIABLE.**

Dated: September 22, 2006

Respectfully submitted,

**Schlichter, Bogard & Denton**

Mary L. Perry - #175911
Jerome J. Schlichter - #0545143
Elizabeth J. Hubertz
Heather Lea
120 W. Main Street
Suite 208
Belleville, IL 62220

and

100 South Fourth Street
Suite 900
St. Louis, MO 63102
Tel: 314-621-6115
Fax: 314-621-7151
mperry@uselaws.com
jschlichter@uselaws.com
ehubertz@uselaws.com
hlea@uselaws.com
Lead Counsel for Plaintiffs

Mary L. Perry - #175911
Jerome J. Schlichter - #0545143
Schlichter, Bogard & Denton
100 South Fourth Street, Suite 900
St. Louis, Missouri 63102
Tel: 314-621-6115; Fax: 314-621-7151

FOR OFFICE USE ONLY

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

Shirley Waldbuesser, Gary Grabek, Mark A. Geuder, Dwite Russell and Julie Spicer, individually and on
See Attached
PLAINTIFF(S)

v.

Northrop Grumman Corporation
See Attached

DEFENDANT(S).

CASE NUMBER

CV06-06213 R (JCx)

Alias
SUMMONS

TO: THE ABOVE-NAMED DEFENDANT(S):

YOU ARE HEREBY SUMMONED and required to file with this court and serve upon plaintiff's attorney Mary Perry, whose address is:

Schlichter, Bogard & Denton
100 South Fourth Street
Suite 900
St. Louis, Missouri 63102

FOR OFFICE USE ONLY

an answer to the ☒ complaint ☐ ____________ amended complaint ☐ counterclaim ☐ cross-claim which is herewith served upon you within 20 days after service of this Summons upon you, exclusive of the day of service. If you fail to do so, judgement by default will be taken against you for the relief demanded in the complaint.

Clerk, U.S. District Court

SEAL

Dated: 10/11/2006

By TERRY BAKER
Deputy Clerk

*(Seal of the Court)*

FOR OFFICE USE ONLY

DOCKETED ON CM
OCT 12 2006
BY ______ 145

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge J. Spencer Letts and the assigned discovery Magistrate Judge is Jacqueline Chooljian.

The case number on all documents filed with the Court should read as follows:

**CV06- 6213 JSL (JCx)**

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

The United States District Judge assigned to this case will review all filed discovery motions and thereafter, on a case-by-case or motion-by-motion basis, may refer discovery related motions to the Magistrate Judge for hearing and determination

---

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

[X] **Western Division**
**312 N. Spring St., Rm. G-8**
**Los Angeles, CA 90012**

[ ] **Southern Division**
**411 West Fourth St., Rm. 1-053**
**Santa Ana, CA 92701-4516**

[ ] **Eastern Division**
**3470 Twelfth St., Rm. 134**
**Riverside, CA 92501**

Failure to file at the proper location will result in your documents being returned to you.

UNITED STA' ·ISTRICT COURT, CENTRAL DISTRICT ·LIFORNIA
CIVIL COVER SHEET

**I (a) PLAINTIFFS** (Check box if you are representing yourself ☐)
Shirley Waldbuesser, Gary Grabek, Mark A. Geuder, Dwite Russell and Julie Spicer, individually and on behalf of all those similarly situated

**DEFENDANTS**
Northrop Grumman Corporation, The Northrop Grumman Corporation Savings Plan Administrative Committee, et al.

(b) County of Residence of First Listed Plaintiff (Except in U.S. Plaintiff Cases):
Cook County, Illinois

County of Residence of First Listed Defendant (In U.S. Plaintiff Cases Only):

(c) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)
Mary Perry, Schlichter, Bogard & Denton, 100 South Fourth Street, Suite 900, St. Louis, Missouri 63102 (314) 621-6115; Fax (314) 621-7151

Attorneys (If Known)

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff
☑ 3 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only (Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☑ 1 Original Proceeding ☐ 2 Removed from State Court ☐ 3 Remanded from Appellate Court ☐ 4 Reinstated or Reopened ☐ 5 Transferred from another district (specify): ☐ 6 Multi-District Litigation ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☑ Yes ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☑ Yes ☐ No ☐ **MONEY DEMANDED IN COMPLAINT: $**________________

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
29 U.S.C. §1001 et seq., Employee Retirement Income Security Act. Breach of fiduciary duty claim.

**VII. NATURE OF SUIT (Place an X in one box only.)**

**OTHER STATUTES**
☐ 400 State Reapportionment
☐ 410 Antitrust
☐ 430 Banks and Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation
☐ 470 Racketeer Influenced and Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Sat TV
☐ 810 Selective Service
☐ 850 Securities/Commodities /Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 890 Other Statutory Actions
☐ 891 Agricultural Act
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 895 Freedom of Info. Act
☐ 900 Appeal of Fee Determination Under Equal Access to Justice
☐ 950 Constitutionality of State Statutes

**CONTRACT**
☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment & Enforcement of Judgment
☐ 151 Medicare Act
☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans)
☐ 153 Recovery of Overpayment of Veteran's Benefits
☐ 160 Stockholders' Suits
☐ 190 Other Contract
☐ 195 Contract Product Liability
☐ 196 Franchise

**REAL PROPERTY**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**TORTS — PERSONAL INJURY**
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Fed. Employers' Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Personal Injury-Med Malpractice
☐ 365 Personal Injury-Product Liability
☐ 368 Asbestos Personal Injury Product Liability

**TORTS — PERSONAL PROPERTY**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**BANKRUPTCY**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**CIVIL RIGHTS**
☐ 441 Voting
☐ 442 Employment
☐ 443 Housing/Accommodations
☐ 444 Welfare
☐ 445 American with Disabilities - Employment
☐ 446 American with Disabilities - Other
☐ 440 Other Civil Rights

**PRISONER PETITIONS**
☐ 510 Motions to Vacate Sentence Habeas Corpus
☐ 530 General
☐ 535 Death Penalty
☐ 540 Mandamus/ Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**FORFEITURE / PENALTY**
☐ 610 Agriculture
☐ 620 Other Food & Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 R.R. & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety /Health
☐ 690 Other

**LABOR**
☐ 710 Fair Labor Standards Act
☐ 720 Labor/Mgmt. Relations
☐ 730 Labor/Mgmt. Reporting & Disclosure Act
☐ 740 Railway Labor Act
☐ 790 Other Labor Litigation
☑ 791 Empl. Ret. Inc. Security Act

**PROPERTY RIGHTS**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**SOCIAL SECURITY**
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
☐ 870 Taxes (U.S. Plaintiff or Defendant)
☐ 871 IRS-Third Party 26 USC 7609

**VIII(a). IDENTICAL CASES:** Has this action been previously filed and dismissed, remanded or closed? ☐ No ☑ Yes

If yes, list case number(s): 1:06-cv-4897, filed in the Northern District of Illinois

JS-6 (JCx)

**FOR OFFICE USE ONLY:** Case Number: ________________

CV06-06213

UNITED STA[illegible] [illegible]ISTRICT COURT, CENTRAL DISTRIC[illegible] [illegible]LIFORNIA
CIVIL COVER SHEET

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

**VIII(b). RELATED CASES:** Have any cases been previously filed that are related to the present case? ☒ No ☐ Yes

If yes, list case number(s): ______

**Civil cases are deemed related if a previously filed case and the present case:**

(Check all boxes that apply) ☐ A. Arise from the same or closely related transactions, happenings, or events; or
☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or
☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE:** List the California County, or State if other than California, in which **EACH** named plaintiff resides (Use an additional sheet if necessary)
☐ Check here if the U.S. government, its agencies or employees is a named plaintiff.
Shirley Waldbuesser: Illinois; Gary Grabek: Illinois; Mark A. Geuder: Illinois; Dwite Russell: Missouri; Julie Spicer: Missouri.

List the California County, or State if other than California, in which **EACH** named defendant resides. (Use an additional sheet if necessary).
☐ Check here if the U.S. government, its agencies or employees is a named defendant.
Los Angeles County, California

**List the California County,** or State if other than California, in which **EACH** claim arose. (Use an additional sheet if necessary)
**Note:** In land condemnation cases, use the location of the tract of land involved.
Los Angeles County, California

**X. SIGNATURE OF ATTORNEY (OR PRO PER):** [signature] **Date** 9/27/2006

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |